UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>James Flaherty Hill,<br><br>Defendants. | Case No. 18-cr-245-4 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant James Flaherty Hill's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 137].[1] The case was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Detectives Briana Lynn Johnson and Matthew Aker and Special Agent Matt Lund testified at the hearing before the undersigned, although only Special Agent Lund testified with respect to the circumstances that gave rise to Hill's motion to suppress. *See generally* (Tr. [Doc. No. 164].) Supplemental briefing was requested, and the Court took the matter under

---

[1] At the hearing, Defendant Nicole Rose Woodworth withdrew her dispositive motion. *See* (Mar. 15, 2019, Minute Entry [Doc. No. 152].) The Court addresses Defendant Chelsey Elizabeth Nelson's dispositive motions [Doc. Nos. 124, 125] in a separate Report and Recommendation.

advisement on April 26, 2019. *See* (Mar. 15, 2019, Minute Entry.)  For the reasons stated below, the Court recommends that Hill's motion be denied.

## I.     BACKGROUND

Hill was allegedly involved in a drug trafficking ring with the other co-Defendants.  *See* (Gov't's Consolidated Resp. to Defs' Suppression Mots. [Doc. No. 142 at 1–5].)  While investigating Defendant James Lee Johnson—the alleged leader of the operation—the Government was informed by a cooperating witness that narcotics sales were being conducted out of Hill's residence.  *See* (*id.* at 2, 5; *see also* Tr. at 132–35; Ex. 1 at 1478.[2])  At the hearing before the undersigned, Special Agent Lund testified that he had "come into contact with a cooperating [witness]" through a "post-*Miranda* interview at jail." (Tr. at 136.)  The cooperating witness had been arrested for possession of methamphetamine, and was ultimately convicted.  (*Id.* at 136, 138.)  As a result of his cooperation, the witness was not charged with an aggravating factor.  (*Id.* at 137.)  On the basis of the information provided by the cooperating witness, Special Agent Lund prepared a search warrant application for which a warrant was issued on November 10, 2016, by an Anoka County judge.  (Ex. 1 at 1479.)  Special Agent Lund planned to execute the search warrant a few days later, on November 15, 2016, because many of the individuals known to be involved in the drug trafficking ring were to be approached with

---

[2] Exhibit 1 is a copy of the search warrant application and issued search warrant for Hill's residence.  When referencing exhibit 1, the Court uses the Bates numbers stamped in the lower right corner of each page.

"extreme caution," and it was not "one of those types of warrants you . . . want to rush into." (Tr. at 138.)

Meanwhile, in preparation for executing the search warrant, Special Agent Lund called other law enforcement agencies to see if any of them had related ongoing investigations. *See* (*id.* at 138–39.) As part of this process, Special Agent Lund learned that pursuant to another search warrant, a GPS tracking device had been installed on a vehicle belong to another potential member of the drug trafficking ring, as a result of which that vehicle was under GPS surveillance. (*Id.* at 141.) Special Agent Lund learned that the owner of the tracked vehicle was thought to be a source of narcotics for Johnson and that the GPS surveillance indicated that the tracked car had been at Hill's residence. (*Id.*) At some point, law enforcement conducted a drive-by of Hill's residence, confirming that the tracked vehicle was parked there. (*Id.* at 142.) On November 14, 2016, through the GPS tracking, Special Agent Lund became aware that the tracked vehicle had left Hill's residence and travelled south to a truck stop. (*Id.*) The vehicle then returned to Hill's residence and law enforcement confirmed through both GPS positioning and visual surveillance that the vehicle was again at Hill's residence. (*Id.* at 143.)

Based on everything law enforcement had learned about the drug trafficking ring, Special Agent Lund believed the occupant of the tracked vehicle "had likely picked up money and then went to the truck stop to pick up a load of methamphetamine." (*Id.*) It was decided that law enforcement would "pull that vehicle over when it left [Hill's residence] in hopes of intercepting a load of methamphetamine." (*Id.*) Special Agent

Lund made contact with patrol units from the Coon Rapids and Blaine Police Departments to assist and effect a traffic stop. (*Id.* at 144.) The goal was

> to make this traffic stop look like just a traffic stop. We wanted it to look like wrong place, wrong time, got pulled over by a patrol cop, gets arrested for the drugs, goes to jail, and then nobody is none the wiser . . . so you don't blow your entire investigation.

(*Id.* at 144–45.) On November 14, 2016, the vehicle was pulled over a few minutes after leaving Hill's residence. Special Agent Lund believed it was "heading towards James Johnson's dad's house which was a few blocks away [from where it was stopped]." In the vehicle, local law enforcement saw "approximately 10 long white . . . packages that appeared to be methamphetamine." (*Id.* at 146.) The driver admitted to the officers that "he had a lot of dope," and law enforcement arranged for a drug sniffing canine unit to sniff the vehicle. (*Id.* at 146–47.) The canine unit took approximately thirty minutes to arrive (*Id.* at 147.) During this time, Hill drove past the traffic stop several times and engaged with the officers on two occasions, asking each time that the vehicle be released to him. (*Id.* at 147.) Officers refused to turn over the vehicle to Hill, and after the canine unit arrived, it alerted to the presence of illegal narcotics. (*Id.* at 148.) The vehicle was towed to a secure impound facility so that a search warrant could be sought for it. (*Id.* at 149.) Special Agent Lund also learned later that day that Hill followed the vehicle back to the impound lot and parked his own vehicle on the street nearby. (*Id.* at 149, 150.) Special Agent Lund considered both Hill's request to have the stopped vehicle turned over to him and Hill's tail of the vehicle while being towed highly unusual. (*Id.* at 148, 149.)

4

Given Hill's behavior, Special Agent Lund was concerned "that they were either going to start removing evidence or destroying evidence." (*Id.* at 150.) As a result, it was decided to execute the search warrant on Hill's residence some time on November 14, 2016, instead of November 15, 2016, as originally planned. (*Id.* at 151.) In addition, law enforcement began "close surveillance on the house so that we could see what was really coming and going." (*Id.*)

It was during this surveillance that a white Plymouth Acclaim—the same car Hill was seen driving during the traffic stop of the now-impounded vehicle—approached Hill's residence and entered the driveway "at a high rate of speed." (*Id.* at 153.) Shortly thereafter, a gray pickup truck pulled into the driveway. (*Id.* at 154.) Also parked in the driveway were a white pickup truck and an "RV camper-trailer-type thing." (*Id.*) Special Agent Lund understood the white pickup truck to belong to Hill. (*Id.*) The driver of the gray pickup truck entered Hill's house and returned approximately ten minutes later carrying a large, heavy orange duffle bag that he put into the truck. (*Id.*) At about this time, Hill got into the white pickup truck and re-parked it in the driveway, so that the front of the pickup was facing away from the house, toward the street. (*Id.* at 155.) Soon thereafter, the grey pickup truck left. Law enforcement believed "there was evidence leaving the residence." (*Id.*)

For this reason, the gray pickup truck was stopped by law enforcement, but a canine sniff did not detect the presence of illegal narcotics and the vehicle was allowed to leave the scene. (*Id.* at 156.) Special Agent Lund stated that if he had conducted the stop, he probably would not have allowed the vehicle to leave and instead would have

5

towed it and impounded it pending issuance of a search warrant because he "believe[d] that there was probable cause to search it for evidence leaving the residence." (*Id.*)

A few minutes later, a maroon vehicle approached Hill's residence. (*Id.* at 157.) The driver entered Hill's house empty-handed and returned a few minutes later carrying "a couple of bags or packages." (*Id.*) Hill was seen conversing with the driver. (*Id.*) Hill, driving the Plymouth Acclaim, and the maroon car both left Hill's residence at about the same time. (*Id.* at 158.) Special Agent Lund continued to be concerned that "more evidence was leaving the residence," and so they attempted to conduct traffic stops of the Plymouth Acclaim and the maroon vehicle. (*Id.*) Hill was seen taking "evasive maneuvers, so we let him go and stayed with the [maroon vehicle]." (*Id.*) Law enforcement eventually stopped the maroon vehicle, and this time a canine sniff alerted to the presence of illegal narcotics. (*Id.* at 159.) A search of the maroon vehicle resulted in law enforcement finding "[o]ne pound of methamphetamine, one pound of cocaine, seven pounds of marijuana, and five firearms." (*Id.*) A few hours later, at approximately 10:00 p.m., the search warrant for Hill's residence was executed, and officers searched the house, the RV, and Hill's white pickup truck. (*Id.* at 160, 161.) The search yielded numerous firearms, a meth pipe, packaging materials and gloves that were observed to have residue on them, vacuum-sealed bags, and "boxes for burner phones, which are these little flip phones that are kind of disposable, very popular with drug dealers because you can toss them and get a new one real quickly. It makes it more difficult for law enforcement." (*Id.* at 161.) In other words, "what you would expect to see for somebody that's selling drugs." (*Id.*)

6

In his motion to suppress, Hill argues that the search warrant for his home was not supported by probable cause, that the *Leon* good-faith exception does not save the unlawful search, and that even if the search of Hill's residence was lawful, Hill's Fourth Amendment rights were violated when the Government searched the white pickup truck in Hill's driveway without a warrant. *See generally* (Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress [Doc. No. 168]; Mot. to Suppress Evidence Obtained as a Result of Search & Seizure.)  Specifically, Hill argues that a four-corners analysis of the affidavit does not establish that the informant relied upon therein was credible or reliable, and because of this defect, no reasonable police office would believe that the issued search warrant was valid. *See* (Mot. to Suppress Evidence Obtained as a Result of Search & Seizure at 1–2.)

## II.     DISCUSSION

As an initial matter, Hill's motion does not identify the items seized pursuant to the challenged search and which the motion now seeks to suppress.  A motion under Federal Rule Criminal Procedure 12(b) to suppress evidence "must identify that evidence and the nature of the challenge." L.R. 12.1(c)(1)(B).  Courts in this district routinely deny suppression motions when a defendant fails to specifically identify the evidence subject to suppression. *See, e.g.*, *United States v. Demikh*, No. 15-cr-113 (MHD/HB), 2015 WL 6445302, at *6 (D. Minn. Oct. 21, 2015) (Bowbeer, Mag. J., as adopted by Davis, J.); *United States v. Hill*, No. 14-cr-276 (ADM/SER), 2015 WL 4136222, at *2 (D. Minn. July 8, 2015) (Montgomery, J., adopting reporting and recommendation of Rau, Mag. J.)  Consequently, the Court could recommendation denying the motion on this basis.

7

Nevertheless, the Court also concludes that Hill's motion also fails on the merits. The following discussion addresses each argument in turn.

### A. Four-Corners Review of the Search Warrant

#### 1. Legal Standard

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. In order to give power to the Fourth Amendment, the Supreme Court has established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). "[T]his judicially created rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 139–40 (internal quotation marks omitted). Stated differently, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

Search warrants are presumptively valid. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). Therefore, a court reviewing a previous determination of probable cause must give "great deference" to the issuing judge's assessment. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted). If the issuing judge "relied solely on the supporting affidavit to issue the warrant, only that information which is found within the four corners of the

affidavit may be considered in determining the existence of probable cause." *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (internal quotation marks omitted). The affidavit must establish a "nexus . . . between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307 (1967). There must also be a nexus between the contraband and the place to be searched. *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). "Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (internal quotation marks omitted). Ultimately, the probable cause standard "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (alteration in original) (internal quotation marks omitted).

   **2.   Analysis**

The Court is satisfied that the search warrant is supported by probable cause. The affidavit contains information that establishes a nexus among the criminal behavior under investigation, the evidence to be seized, and the places to be searched. The supporting affidavit is not "glaringly deficient" such as "mak[ing] no attempt to identify with any specificity the source of information, the basis of knowledge, age of knowledge, or any other information that would bear on" the veracity of the affiant's information that reviewing courts consider in the context of probable cause determinations. *United States v. Nelson*, No. 04-cr-4651 (DWF/JSM), 2005 WL 1355025 at *1, 2 n.1 (D. Minn. June 2, 2005) (Frank, J.).

Furthermore, the Court is not persuaded by Hill's argument that the cooperating witness was not credible or reliable.

> The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.

*United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993) (citing *Draper v. United States*, 358 U.S. 307, 313 (1959)). "If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id.* (citing *Gates*, 462 U.S. at 233–34; *Draper*, 358 U.S. at 313).

In the supporting affidavit, Special Agent Lund detailed various information provided by the cooperating witness, including: (1) that the witness received a request from an individual named "Jay" to go to a residence "to pick up a large amount of methamphetamine"; (2) "Jay" was from Forest Lake, had a warrant for his arrest, and disguises his appearance while in public; (3) there was another individual, known as "Whitey" who lived at the address; (4) the address was of the residence in question; (5) the residence was brown; and (6) there was a large camping trailer in the driveway of the residence. (Ex. 1 at 1478.) In the affidavit, Special Agent Lund also detailed the steps he took both on his own and with the help of other law enforcement officers to corroborate the cooperating witness's statements, including: (1) providing unlabeled photographs of Defendants Johnson and Hill to the witness who identified them as "Jay" and "Whitey,"

10

respectively; (2) confirming that Hill lived at the address by reviewing records maintained by the Department of Motor Vehicles; (3) confirming that Hill's residence was brown through a drive-by inspection of the premises; (4) confirming the presence of large camping trailer at the address; and (5) locating a warrant for Johnson's arrest and learning that he formerly resided in Forest Lake. (*Id.*)

Given the corroboration that occurred, it was permissible to conclude that the cooperating witness was credible and that therefore other information the witness provided was reliable. *Cf. Williams*, 10 F.3d at 593. Accordingly, in view of the deference afforded issued search warrants and because the Court has not found any glaring deficiencies in the affidavit (nor has Hill pointed to any), the Court concludes that the search warrant is supported by probable cause. Consequently, because the Court concludes that the search warrant is valid, it need not reach Hill's arguments regarding the application of the *Leon* good-faith exception.[3]

### B. Search of the White Pickup Truck

Hill also argues that even if the search warrant was valid, it nevertheless did not specifically identify the white pickup truck as a location to be searched, and the warrantless search of the pickup truck was not appropriate under any of the "automobile exceptions" for warrantless searches. *See* (Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress at 1–4.)

---

[3] That said, having conducted a separate independent review of the search warrant application, the Court does not agree with Hill's assessment that no reasonable officer could conclude the search warrant affidavit was supported by probable cause. *Cf. United States v. Leon*, 468 U.S. 897, 922 (1984).

11

Critically, *United States v. Coleman*, 909 F.3d 925 (8th Cir. 2018), forecloses Hill's arguments. In *Coleman*, the Eighth Circuit concluded a search warrant executed "to search 'the premises and curtilage area' permitted the officers . . . to search a vehicle parked in the curtilage." 909 F.3d at 932. In the instant case, the search warrant sought "a warrant to search the *premises and vehicle*," and the premises were described to include "garages, sheds and storage areas and the home[']s *curtilage*." (Ex. 1 at 1477 (second emphasis added).) Because the Court concludes the search warrant is valid, *Coleman* is controlling, and the search of the white pickup truck parked in Hill's driveway—i.e., within the home's curtilage—is permissible. *Cf. Coleman*, 909 F.3d at 932.[4]

## III. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant James Flaherty Hill's ("Hill") Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 137] be **DENIED**.

Dated: May 22, 2019

                                                *s/ Hildy Bowbeer*
                                                HILDY BOWBEER
                                                United States Magistrate Judge

---

[4] Because the Court concludes pursuant to *Coleman* that the search warrant to search the premises including "the home[']s curtilage" authorized the search of the white pickup parked in the curtilage even though the truck was not specifically named in the warrant, the Court need not address the other arguments raised by the Government in defense of the search.

## Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.